**Robert Barry BELCHER, et al.**

v.

**SHONEY'S, INC.**

No. 3:95–1151.

United States District Court,
M.D. Tennessee,
Nashville Division.

Dec. 21, 1998.

---

M. Reid Estes, Jr., Jeffrey L. Peterson, Nashville, TN, for plaintiffs.

Michael John Mueller, Washington, D.C., Kenneth Weber, Nashville, TN, for defendant.

## MEMORANDUM

CAMPBELL, District Judge.

### I. *Introduction*

Pending before the Court are Class Plaintiffs' Motion For Partial Summary Judgment (Docket No. 1416) and Defendant's Motion For Partial Summary Judgment (Docket No. 1640). For the reasons set forth below, the Class Plaintiffs' Motion is GRANTED, and the Defendant's Motion is DENIED.

### II. *Factual and Procedural Background*

Plaintiffs, who have worked as General Managers and Assistant Managers at the Defendant's Shoney's restaurants, brought this collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") seeking payment of overtime compensation and other damages. Plaintiffs claim that the Defendant classified them as salaried, exempt employees, but treated them as hourly workers.

Through their pending Motion, Plaintiffs contend that Defendant has failed to comply with the requirement that exempt employees be paid on "a salary basis," pursuant to 29 C.F.R. § 541.118, because the Defendant has had a policy and practice of docking the salary of General Managers and Assistant Managers for their restaurant's cash shortages and casualty losses.

During the three-year period prior to the filing of this suit, Defendant operated approximately 350 restaurants in 23 states. (Class Plaintiffs' Response To Defendant's

Statement Of Material Facts In Support Of Its Cross–Motion For Partial Summary Judgment, And In Opposition To Plaintiffs' Motion For Partial Summary Judgment, at ¶ 4 (Docket No. 1772)[hereinafter "Plaintiffs' Response To Material Facts"] ).[1] Defendant's restaurants are managed by a General Manager and an Assistant Manager who are responsible for the overall operation of their restaurant. (*Id.,* at 8, 10, 12).

Although Defendant denies it, Plaintiffs contend the cash shortage/casualty loss policy has existed since the 1960's. Plaintiffs' documentary evidence relevant to this alleged policy primarily relates to the period after 1985. For example, Shoney's Manager's Reference Manual, revised April, 1985 edition, under the heading "SECURITY RESPONSIBILITY," describes a Manager's responsibility for the restaurant's funds:

> The Manager is responsible for the financial management of the unit and must comply with Company standards and procedures in this respect. The Manager must at all times be able to account for Company funds entrusted in his/her care, sales receipts and deposits, paid-outs, and other expenses incurred in his/her unit, shortages, prompt processing of invoices and budgetary control over all controllable expenses. He/she must maintain accurate and up-to-date financial records and submit necessary reports on a timely basis.

(Exhibit 71 to Class Plaintiffs' Motion). Another document from this time period, a Memorandum from Craig Barber to "All Accounting Personnel," which attaches Defendant's "Employee Accounts Receivable Policy" dated November 21, 1985, indicates that the company contemplated employee repayment of missing or lost deposits for which the restaurant managers were responsible:

> 6. *Missing or lost deposits to be repaid by an employee* should have the following completed paper work:
>
> A. Signed Promissory note
>
> B. Signed payroll deduction form

> C. Signed statement that all bonuses are to be deducted until Shoney's, Inc. is paid in full

\* \* \* \* \* \*

*REPAYMENT OF CASH SHORTAGES*

> 1. A separate deduction code is set up for repayment of each advance.
>
> 2. Shortages should not be set up as an employee receivable. Such amounts should be credited to "Cash Short" on the P & L as collected.

(Exhibit 78 to Class Plaintiffs' Motion)(emphasis added).

The next documentary evidence of Defendant's cash shortage/casualty loss policy is a Memorandum dated January 29, 1990 from Taylor Henry, Jr., Defendant's Chief Financial Officer, to "Officers, Divisions Directors, Department Heads, and Division Controllers," which describes a policy change regarding "Missing Store Deposits":

> The following policies adopted at the Monday staff meeting held on January 29, 1990 are effective immediately:
>
> \* \* \* \* \* \*
>
> *Missing Store Deposits*
>
> 1. *Presently, the person responsible for the missing store deposit signs an agreement to repay the loss* through payroll deductions. The cash shortage is charged to 'Employee Receivables.'
>
> 2. *New policy*—the missing deposit should be immediately charged to the store as 'casualty loss.' *The responsible employee may sign an agreement to repay the loss through payroll deductions.* At the end of each period, the amount collected will be credited to the account initially charged, 'casualty losses.'

(Exhibit 79 to Class Plaintiffs' Motion; Defendant's Response To Class Plaintiffs' Statement Of Material Facts As To Which There Is No Genuine Issue For Trial, at ¶ 127 (Docket No. 1643)[hereinafter "Defendant's Response To Material Facts"] )(emphasis added). As the document indicates, this policy change was adopted at a staff meeting

---

1. According to Plaintiffs, Defendant operated 325 restaurants at the end of 1992; 346 in 1993; 361 in 1994; and 356 as of October, 1995. (*Id.*)

attended by corporate officers, Division Directors, Department Heads and Division Controllers. (Defendant's Response To Material Facts, at ¶ 116). The policy change was later discussed at a meeting of the Executive Committee of the Defendant's Board of Directors, as reflected in the Minutes of the February 20, 1990 meeting of Shoney's Executive Committee:

> Next, Mr. Henry discussed the adoption of three new Company policies.
>
> *   *   *   *   *   *
>
> Mr. Henry then discussed a change in accounting for missing deposits. He said *in the past an employee responsible for a missing deposit would sign an agreement to repay the loan through payroll deductions.* The cash shortage was charged to 'Employee Receivables.' In many cases, the employees left the Company before repaying the missing deposit and the Company had an uncollectible accounts receivable. The new policy concerning missing deposits would require an immediate charge to the individual store as a 'Casualty Loss.' *The person responsible may sign an agreement to repay the loss through payroll deductions and as payments are received, the store receives the credit.*

(Exhibit 96 to Class Plaintiffs' Motion; Defendant's Response To Material Facts, at ¶ 119)(emphasis added).

In connection with this policy change, Defendant's Chief Financial Officer and its Controller, Taylor Henry, Jr. and Michael Payne, respectively, directed Steven Goss, Defendant's Payroll Manager/Director, to draft a standardized form regarding the method for processing payroll deductions for "loss reimbursements." (Defendant's Response To Material Facts, at ¶¶ 121–22, 127–129). The Memorandum, dated February 12, 1990 from Steven Goss to "Division Presidents" and "Division Directors," is entitled "Shoney's Inc. Payroll Deduction Authorization Casualty Loss Reimbursement" and states as follows:

> Re: *PAYROLL DEDUCTIONS FOR LOSS REIMBURSEMENTS*
>
> IN ACCORDANCE WITH THE RECENT CHANGE IN COMPANY POLICY, A NEW PAYROLL DEDUCTION HAS BEEN SET UP *TO RECOVER MISSING DEPOSITS, ETC. FOR WHICH AN EMPLOYEE IS HELD RESPONSIBLE AND WHO HAS AGREED TO REPAY THE COMPANY THROUGH PAYROLL DEDUCTIONS.*
>
> A.  ALL DEDUCTIONS UNDER THIS CODE WILL BE CREDITED TO CASUALTY LOSSES AT THE STORE WHERE THE LOSS WAS ORIGINALLY CHARGED.
>
> B.  TRANSFER OF THE EMPLOYEE WILL NOT STOP THE DEDUCTION.
>
> C.  TRANSFER OF THE EMPLOYEE WILL NOT CHANGE THE CREDITED STORE.
>
> D.  IF THE EMPLOYEE TERMINATES, THE DEDUCTION WILL REACTIVATE IN THE EVENT OF REHIRE.
>
> E.  DOLLAR AMOUNT TO BE DEDUCTED FROM REGULAR CHECKS IS TO BE SPECIFIED.
>
> F.  PAYBACK PERIOD FROM REGULAR PAY MAY NOT EXCEED 52 WEEKS.
>
> G.  DEDUCTION WILL APPLY TO ALL BONUS PAID (MINIMUM 50% OF NET BONUS) IN ADDITION TO NORMAL FIXED DEDUCTIONS FROM REGULAR PAY.
>
> H.  DEDUCTIONS WILL GO INTO ARREARS. (IF WE ARE UNABLE TO TAKE A DEDUCTION IN ANY GIVEN WEEK, THE AMOUNT TO BE TAKEN WILL DOUBLE THE FOLLOWING WEEK).
>
> I.  ANY BALANCE REMAINING AT TERMINATION MAY BE TAKEN FROM ANY FUNDS DUE AN EMPLOYEE FROM SHONEY'S INC. (I.E. NET FINAL PAY AND STOCK PURCHASE DEDUCTIONS).
>
> J.  AS WITH ANY PAYROLL DEDUCTION, AN AUTHORIZATION FORM MUST BE SIGNED BY THE EMPLOYEE. THE ATTACHED FORM MAY BE COPIED AND USED IN YOUR AREA. USE THIS

FORM ONLY FOR CASUALTY LOSSES CHARGABLE (sic) TO YOUR P & L. ANY OTHER TYPE OF DEDUCTION WILL REQUIRE A DIFFERENT FORM. ALSO, NOTE THAT FOUR SIGNATURES ARE REQUIRED, INCLUDING THE REGIONAL VICE PRESIDENT, OR HIGHER OFFICER, OF THE DIVISION.

K. SHOULD AN EMPLOYEE BECOME RESPONSIBLE FOR A SUBSEQUENT LOSS WITH AMOUNTS STILL DUE ON A PREVIOUS LOSS, THE DIVISION VICE–PRESIDENT FOR OPERATIONS MUST APPROVE SUCH DEDUCTION FORMS. IF A SECOND STORE IS INVOLVED, ANY REMAINING BALANCE DUE THE FIRST STORE MUST BE TRANSFERRED, VIA P & L CHARGE, TO THE SECOND STORE (ONLY ONE DEDUCTION MAY BE ACTIVE WITH ONLY ONE STORE RECEIVING CREDIT).

L. PAYROLL WILL NOTIFY THE OFFICER RESPONSIBLE FOR DIVISION OPERATIONS OF ANY CHANGES IN DEDUCTION OR TERMINATIONS WITH A BALANCE DUE.

M. CONSULT WAGE AND HOUR LAWS BEFORE DEDUCTING ANY MONIES FROM AN EMPLOYEE CHECK.

(Exhibit 80 to Class Plaintiffs' Motion)(emphasis added). The memorandum attaches a form entitled "SHONEY'S INC. *PAYROLL DEDUCTION AUTHORIZATION CASUALTY LOSS REIMBURSEMENT*," which states as follows:

SHONEY'S INC.
PAYROLL DEDUCTION AUTHORIZATION
CASUALTY LOSS REIMBURSEMENT

Division \_\_\_\_
Store # \_\_\_\_
Date \_\_/\_\_/\_\_

EMPLOYEE NAME

_____
(PLEASE PRINT)

_____-____-_____
(SOCIAL SECURITY NUMBER)

_____

*THIS FORM REQUIRES FOUR SIGNATURES BEFORE IT IS VALID.*

*I. _____, HEREBY AGREE TO REIMBURSE SHONEY'S INC. IN THE AMOUNT OF \_\_\_\_. THIS AMOUNT WILL BE DEDUCTED AT \_\_% OF ALL BONUSES I MAY EARN IN ADDITION TO A DEDUCTION FROM MY REGULAR PAY AT THE RATE OF* $\_\_\_ *PER WEEK FOR A MAXIMUM OF \_\_ WEEKS.*

*IN THE EVENT OF MY SEPARATION OF EMPLOYMENT WITH SHONEY'S INC., ANY BALANCE REMAINING ON THIS AGREEMENT MAY BE DEDUCTED FROM MY FINAL PAY OR ANY OTHER MONIES HELD BY SHONEY'S INC. FOR MY ACCOUNT.*

REASON FOR DEDUCTION: _____
_____

_____
(EMPLOYEE SIGNATURE)

_____
(SUPERVISOR SIGNATURE)

_____
(DIVISION DIRECTOR SIGNATURE)

_____
(REQUIRED OFFICER'S SIGNATURE)

_____

(*Id.;* Same as Exhibit 89 to Class Plaintiffs' Motion). Defendant admits that this form "was available for use at some locations and during some time periods, and that it was used on some occasions." (Defendant's Response To Material Facts, at ¶ 57).

With regard specifically to lost bank deposits, Mr. Goss, Defendant's Director of Payroll during the time in question, has testified that from 1986 through August of 1994, Defendant's restaurant management employees who violated Defendant's bank deposit procedures resulting in a loss to the Defendant could incur a payroll deduction for that loss. (Defendant's Response To Material Facts, at ¶ 88). According to Mr. Goss, Defendant's restaurant management employees were informed of this policy in writing. (*Id.*, at ¶ 90). Another management employee of the Defendant testified that this policy had been in effect from 1976 through 1993, when he left the company for a few years. (*Id.*, at ¶ 89).

This policy is also reflected in a January 31, 1991 Memorandum from Roy Armstrong, who, at the time, supervised seven Shoney's restaurants:

POST ON OFFICE WALL
MEMORANDUM

TO: CENTRAL DIVISION MANAGEMENT

FROM: ROY ARMSTRONG

DATE: JANUARY 31, 1991

SUBJECT: BANK DEPOSIT PROCEDURES

DEPOSITS

1. Each unit is required to make at least (4) four deposits daily (not at the same time). This is for your protection as well as Shoney's.

2. All deposits must be made in a locked deposit bag. Go *directly* to the bank. Drop each deposit in the night depository. Be alert for suspicious people and conditions. Note: When making any night deposit you must have a police escort or an employee follow you to the bank. This is for your safety and protection.

3. You should have three copies of each deposit slip.:

#1. One remains in the store

#2. One for bank to send to our accounting department

#3. One for teller or bank reference

4. Each deposit slip must have the following information:

#1. Store # and Name

#2. Bank Account #

#3. Signature of person making deposit

#4. Number of deposit (1,2,3,4, etc.)

#5. Bag number of deposit

5. Log each and every deposit and bag number in the red book.

6. Pick up deposit bags the following business day. Check through your bags and remove the verified deposit slips. Match the verified slips to your deposit log. After making sure all deposits reached the bank and are correct, attach verified slips to your daily sales reports.

7. Set up a period folder to hold all DSR reports with original and validated deposit slips stapled to these reports.

*FAILURE TO FOLLOW THE ABOVE PROCEDURES WILL RESULT IN YOUR BEING SOLELY RESPONSIBLE FOR REIMBURSING THE COMPANY FOR THE ENTIRE AMOUNT OF THE DEPOSIT.*

Every Management Person who handles bank deposits will read and initial this memo. They will also need to sign the attached slip and return it to Mr. Armstrong's office.

(Exhibit 93 to Class Plaintiffs' Motion)(emphasis added). Defendant contends that neither this memorandum nor ones with similar language, were widely disseminated to General Managers or Assistant Managers. (Defendant's Response To Material Facts, at ¶¶ 93, 94).

Another document submitted by Plaintiffs indicates that, as of March, 1994, General Managers and Assistant Managers were required to sign a form agreeing to reimburse the Defendant for lost bank deposits. In a

letter dated February 23, 1995 from Steve Bashen, an EEO Claims Analyst employed by Defendant, to Marcia Hall Craig, an EEOC investigator, discussing a claim filed by a former employee, Timothy W. Scott, Mr. Bashen stated: "As a manager, Mr. Scott was required to review and sign the *Cash* acknowledgment document ..." (Exhibit 83 to Class Plaintiffs' Motion). This "Cash" document, which was attached to the letter, provides as follows:

### CASH

I understand as a part of Management, that I am responsible for the cash of the store, including the change fund and freely assume this responsibility as part of my Management job. I agree to handle the Company's funds in a responsible and business like manner at all times.

I further understand that deposits are to be worked up and taken to the bank immediately thereafter and that No (sic) deposits are to be left in the store. *For failure to fulfill these obligations, I agree to reimburse the Company should it be requested of me.*

I also understand that the Change Fund is to be used strickly (sic) for Company business and not for loans. Failure to follow this procedure could result in removal of Management position.

I have read the above and understand.

Date _____ Name _____

(*Id.*)(emphasis added). Defendant contends that Plaintiffs have failed to discover any evidence indicating that any General Managers or Assistant Managers ever signed this document. (Defendant's Response To Material Facts, at ¶¶ 25–27).

More recently, Defendant mentioned its cash shortage policy, which applied specifically to General Managers and Assistant Managers, in its January 1995 edition of the Manager's Reference Manual:

**2.** The Manual also includes in its list of infractions "which will result" in corrective action:
13. Damaging or destroying company property due to careless or willful acts.
\* \* \* \* \* \*
23. Failure to follow cash handling procedures.

15. **Cash Shortage Policy:** If you are responsible for cash or credit card transactions and a shortage occurs, you may be subject to disciplinary action which may include a written warning, *reimbursement,* suspension, or termination.

(Exhibit 73 to Class Plaintiffs' Motion)(emphasis added).[2]

Defendant admits that this " 'Cash Shortage Policy' authorized the supervisors of Defendant's General Managers and Assistant Restaurant Managers ... to request reimbursement of cash shortages through execution of a form authorizing deductions from salary or bonuses from those responsible for them." (Defendant's Response To Material Facts, at ¶ 77). Defendant also admits that "[o]n some occasions prior to June 1995, Defendant disciplined some General Managers and Assistant Restaurant Managers in its Shoney's concept restaurants for violating their duties of protecting company funds [or "cash handling or money management procedures"] by seeking reimbursement of losses from some such General Managers and Assistant Restaurant Managers." (Defendant's Response To Material Facts, at ¶¶ 42, 46).

According to Defendant, as of March 10, 1995, the company no longer permitted deductions from a manager's salary for cash shortages or casualty losses. On that date, George Neal distributed a memorandum stating:

Effective immediately, no payroll deductions can be required, established or taken from any employee's pay for any type of financial loss. This includes lost money, cash shortages, missing money from safes, missing deposits, theft, or damage to company property or cars.

(Exhibit 84 to Class Plaintiffs' Motion). Plaintiffs contend, however, that the policy continued after this memorandum was issued. They point to a Memorandum dated

(Exhibit 75 to Class Plaintiffs' Motion).

January 12, 1996 from the office of Vincent P. Wilson, who was then a Regional Director and/or Supervisor over Defendant's Shoney's concept restaurants, which provides as follows:

To:      ALL MANAGERS

DATE:      January 12, 1996

RE:      DEPOSITS

> THIS MEMO IS A REMINDER OF POLICIES THAT SHOULD ALREADY BE IN PRACTICE.
>
> ALL DEPOSITS SHOULD BE BAGGED INDIVIDUALLY AND SHOULD BE TAKEN TO THE BANK SEPARATELY. MONDAY—THURSDAY, THERE SHOULD BE A MINIMUM OF THREE (3) DEPOSITS MADE FOR THE DAY. THERE SHOULD BE A MINIMUM OF FOUR (4) DEPOSITS MADE FRIDAY, SATURDAY, AND SUNDAY. ONLY THE LAST DEPOSIT FOR THE DAY STAYS IN THE STORE OVERNIGHT.
>
> PLEASE BE AWARE THAT *IF A ROBBERY OCCURS AND THERE IS MORE THAN ONE DEPOSIT LEFT IN THE STORE, THE MANAGER RESPONSIBLE FOR THE UNDELIVERED DEPOSIT WILL HAVE TO PAY THE AMOUNT OF THAT DEPOSIT BACK.*

VPW/mw

(Exhibit 88 to Class Plaintiffs' Motion)(emphasis added). In his deposition, Mr. Wilson testified that his secretary distributed this memorandum without his prior approval. (Volume 3 of Defendant's Exhibit 1, Deposition Excerpts, filed in support of Defendant's Cross–Motion For Partial Summary Judgment And In Opposition To Plaintiffs' Motion For Partial Summary Judgment, at 71–72 (Docket No. 1644)). On the other hand, Mr. Wilson testified that the memo had been distributed at some previous time, and that it was never retracted. (Excerpts of Deposition of Vincent Wilson, at 77–78, 80–83, Exhibit 106 to Class Plaintiffs' Motion).

It is undisputed that, between December, 1992 and June, 1995, Defendant made at least 1,229 deductions for cash and/or casualty losses through payroll deductions from the salaries of General Managers and Assistant Managers. (Defendant's Response To Material Facts, at ¶ 145). The parties also agree that 107 of 3,048, or 3.5%, of managers were affected by the deductions. (Plaintiffs' Response To Material Facts, at ¶¶ 8, 87). Plaintiffs contend that these managers were employed at over 100 separate restaurants. Defendant contends that only 81 of its 350 restaurants were involved. (*Id.*, at ¶ 147). It is undisputed that the deductions occurred in approximately 40% of the 127 operational areas that existed during the 30–month period. (Plaintiffs' Response To Material Facts, at ¶ 89).

### III. *Standards For Considering Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In order to defeat the motion, the nonmoving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of that party's case upon which he will bear the burden of proof at trial. *Celotex Corp.*, 106 S.Ct. at 2553. In order to create a genuine factual issue, the nonmoving party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although the nonmovant need not show that

the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

A preponderance of the evidence standard is used in this determination. *Id.* Therefore, if the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," the motion for summary judgment may be granted. *Id. See also Matsushita Electric,* 106 S.Ct. at 1356.

### IV. Compliance With The Salary Basis Test

■ The FLSA requires payment of overtime to an employee who works over 40 hours in a single week, unless the employee qualifies as a "bona fide executive, administrative, or professional" employee who is paid on "a salary basis." 29 U.S.C. § 213(a)(1). As the FLSA is a remedial statute, exemptions are to be narrowly construed against the employer who seeks to assert them, and the burden is on the employer to prove an exemption applies. *See, e.g., Douglas v. Argo–Tech Corp.,* 113 F.3d 67, 70 (6th Cir. 1997).

Through their pending Motion, Plaintiffs contend that Defendant has failed to comply with the requirement that they be paid on "a salary basis." The regulations promulgated by the Secretary of Labor provide that an employee will be considered to be paid on a "salary basis:"

> ... if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, *which amount is not subject to reduction because of variations in the quality or quantity of the work performed...*

29 C.F.R. § 541.118(a)(emphasis added).[3]

Plaintiffs contend that the salaries they were paid as General Managers and Assistant Managers were "subject to" reduction because of variations in the quality of the work performed because Defendant had a

policy and practice of requiring reimbursement for cash shortages and casualty losses. The Supreme Court recently addressed the meaning of the phrase "subject to" in *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). The plaintiffs in *Auer,* sergeants and a lieutenant employed by the St. Louis Police Department, claimed they were not exempt under the FLSA because the St. Louis Metropolitan Police Department Manual provided that their salaries could be reduced for a variety of disciplinary infractions related to the quality or quantity of their work. 117 S.Ct. at 908. Only one sergeant was actually subjected to a disciplinary deduction under the policy. 117 S.Ct. at 910.

In settling on a definition for the phrase "subject to," the Court relied on the interpretation given by the Secretary of Labor in an amicus brief filed at the request of the Court:

> The Secretary of Labor ... interprets the salary-basis test to deny exempt status when employees are covered by a policy that permits disciplinary or other deductions in pay 'as a practical matter.' That standard is met, the Secretary says, if there is either an actual practice of making such deductions or an employment policy that creates a 'significant likelihood' of such deductions. The Secretary's approach rejects a wooden requirement of actual deductions, but in their absence it requires a clear and particularized policy— one which 'effectively communicates' that deductions will be made in specified circumstances. This avoids the imposition of massive and unanticipated overtime liability (including the possibility of substantial liquidated damages, *see, e.g., Kinney v. District of Columbia,* supra, [994 F.2d 6] at 12 [(1993)]) in situations in which a vague or broadly worded policy is nominally applicable to a whole range of personnel but is not 'significantly likely' to be invoked against salaried employees.

117 S.Ct. at 911. Thus, a plaintiff must show either (1) an actual practice of making deductions; or (2) an employment policy that cre-

---

**3.** The regulation then lists several exceptions to the rule, one of which is for deductions made "in good faith for infractions of safety rules of major significance." 29 C.F.R. § 541.118(a)(5).

ates a "significant likelihood" of such deductions.

Applying this approach to the St. Louis Police Department, the Court pointed out that the policy relied on by the plaintiffs lists a total of 58 possible rule violations and specifies a range of penalties for each, including a deduction in pay. 117 S.Ct. at 911. The Court also pointed out that all employees, not just those paid on a salary basis, were covered by the policy. *Id.* Applying the Secretary's approach, the Court concluded that the policy did not " 'effectively communicate' that pay deductions are an anticipated form of punishment for employees in petitioners' category" since it "applies both to petitioners and to employees who are unquestionably not paid on a salary basis" and "the expressed availability of disciplinary deductions may have reference only to the latter." *Id.*[4] In addition, the Court explained, a one-time deduction in an employee's pay "under unusual circumstances" does not establish a likelihood of disciplinary deductions. 117 S.Ct. at 912.

■ The Class Plaintiffs contend that their salaries were improperly "subject to" reduction because Defendant's cash shortage/casualty loss policy created a 'significant likelihood' of such deductions and because Defendant had an actual practice of making such deductions. Defendant argues that its cash shortage policy permitted, but did not require, deductions from salary for losses, and that those employees who refused to accept a deduction were not fired.

The Court is persuaded that the undisputed evidence in this case establishes an employment policy that created a significant likelihood that the salaries of General Managers and Assistant Managers would be reduced for cash shortages or casualty losses at their restaurants. Defendant's Director of Payroll at the time in question has admitted that from 1986 through August, 1994, restaurant management employees could incur a payroll deduction for losses caused by the failure to comply with Defendant's bank deposit procedures, and were informed of this policy in writing. Confirming that this policy existed is a 1991 memorandum written by a supervisor of seven restaurants clearly stating that reimbursement is required for missing bank deposits. Furthermore, in 1995, Defendant expressly stated in its Manager's Reference Manual that reimbursement was one of four disciplinary actions that managers would be "subject to" for cash or credit card shortages. There is also evidence indicating that at least some managers were requested to sign a document agreeing to this reimbursement policy.

That General Managers and Assistant Managers would be responsible for reimbursing the Defendant for cash shortages and casualty losses was recognized at the highest levels of the company. The Chief Financial Officer wrote a memorandum about the reimbursement procedure in 1990, after the procedure was adopted at a meeting of corporate officers, division directors, department heads and division controllers. The reimbursement process was even discussed at a meeting of the Board of Directors' Executive Committee in 1990. To further the execution of the policy, the company issued a memorandum to its Division Presidents and Directors setting forth the procedure for reimbursements,[5] and distributed a standardized form for use in effecting the reimbursements—"Shoney's Inc. Payroll Deduction Authorization Casualty Loss Reimbursement."

Defendant's argument that the reimbursement policy permitted, but did not require, deductions, and that the company did not fire employees who refused to accept a deduction, does not distinguish the reimbursement policy from the type of clear and particularized policy described by the Court in *Auer.* In the words of the *Auer* Court, the reimbursement policy "*permit[ted]* disciplinary ... deductions in pay 'as a practical matter,' " and

---

4. The Court did, however, state that "[if] the statement of available penalties applied solely to petitioners, matters would be different." *Id.*

5. This memorandum suggests that the company was very serious about recovering its losses. The policy requires that "Any balance remaining at termination may be taken from any funds due an employee...," and "[i]f the employee terminates, the deduction will reactivate in the event of re-hire." (Exhibit 80 to Class Plaintiffs' Motion).

created a "significant likelihood" that deductions would be made to the salaries of those responsible for cash shortages or casualty losses.[6] 117 S.Ct. at 911 (emphasis added). Plaintiffs are not required to produce a company-wide memorandum setting forth the reimbursement policy, nor must they prove that every employee was aware of the policy, for the Court to conclude that the policy effectively communicated that deductions were likely to be made for cash shortages and casualty losses. *See, e.g., Hernandez v. City of Santa Ana*, 134 F.3d 377 (Table), 1998 WL 23207 (9th Cir. Jan.21, 1998)(Plaintiffs' pay was "subject to" deduction even though policy permitting deduction applied to exempt and non-exempt employees, and even though employer had not applied deduction to anyone in plaintiffs' job category).

The Court also concludes that Defendant had an actual practice of making deductions for cash shortages and casualty losses. Defendant made 1,229 deductions that were spread over several years and occurred in 23% of the company's restaurants and 40% of its operational areas. The company even had a form specifically drafted for this purpose, and an accounting procedure that was approved by the Executive Committee of the Board of Directors. *See, e.g., Rushing v. Shelby County Government*, 1997 WL 901901, *2–3 (W.D.Tenn. April 23, 1997)(Seven deductions involving several employees in 1992 and 1995 constitutes actual practice of improper deductions). The evidence does not indicate that these deductions were isolated, or in the words of the *Auer* Court, "unusual."

■ Even if the Court concludes that Plaintiffs' salaries were improperly "subject to" deduction, Defendant argues, the deductions were imposed "in good faith for infractions of safety rules of major significance," and therefore, fall within an exception to the

"salary basis" test. According to Defendant, 70% of the 107 managers who received deductions were disciplined for violation of Defendant's bank deposit and cash handling procedures, and those procedures constitute "safety rules of major significance." [7]

As discussed above, the salary basis regulation provides an exception to the salary basis requirements for deductions made "in good faith for infractions of safety rules of major significance." 29 C.F.R. § 541.118(a)(5). The regulation goes on to explain that "[s]afety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines." *Id.*

In construing the rule, courts have consistently limited the definition of major safety rules to those situations specifically described—rules designed to prevent serious harm to the employer's property or to fellow employees. *See, e.g., Avery v. City of Talladega*, 24 F.3d 1337, 1341–42 (11th Cir.1994)(Docking police officer's pay for leaving scene of apparent suicide does not constitute deduction for violation of safety rule of major significance); *Shockley v. City of Newport News*, 997 F.2d 18, 24–25 (4th Cir.1993)(Rule requiring that an employee call in to report his absence does not constitute safety rule of major significance); *Klein v. Rush–Presbyterian–St.Luke's Medical Center*, 990 F.2d 279, 286 (7th Cir. 1993)(Court agrees with Wage and Hour opinion letter that rules for prevention of serious danger do not include nursing rules relating to patient well-being and job performance).

According to the Defendant, its cash handling and bank deposit procedures require

---

**6.** Furthermore, unlike the policy in *Auer*, the evidence indicates that the reimbursement policy was primarily directed to General Managers and Assistant Managers, who were responsible for protecting the restaurant's funds, and not to hourly workers. Thus, unlike *Auer*, it is not possible to give effect to the policy without applying it to otherwise exempt management employees.

**7.** For purposes of ruling on the pending motions, the Court finds it unnecessary to determine whether these managers were actually disciplined through deductions for violating cash handling/bank deposit procedures, rather than something else. The Court will also assume, but does not find, that Defendant made these deductions "in good faith," notwithstanding evidence to the contrary. (*See, e.g.,* Letter dated February 14, 1995 from M. Megan Shemwell to Grace Burdette; Exhibit 82 to Class Plaintiffs' Motion).

that managers (i) take multiple deposits to the bank at different times of the day, (ii) use locked deposit bags, (iii) use a police or employee escort when making nights deposits, (iv) take alternate routes to the bank, and (v) go immediately from the restaurant to the bank without intermediate stops. (Defendant's Memorandum Of Law In Opposition To Plaintiffs' Motion For Partial Summary Judgment, And In Support Of Defendant's Cross–Motion For Partial Summary Judgment, at 20–21 (Docket No. 1641)). On the restaurant premises, managers are required to (i) remove excess cash from the cash register at different times during the day, (ii) limit access to the register to certain personnel, but (iii) not resist a robbery attempt. (*Id.*) Defendant contends that these procedures were implemented to protect employees from workplace violence and to decrease the likelihood of robberies and related violence by reducing in a regular and consistent manner the amount of cash on hand at each restaurant. (*Id.*) Defendant cites no cases holding that the restaurant cash handling and bank deposit procedures are "safety rules of major significance."

Unlike the rules described in the regulation, "prohibiting smoking in explosive plants, oil refineries, and coal mines," Defendant's rules and procedures are not suffi-

ciently related to employee safety to come within the "major safety rule" exception.[8] Indeed, instead of "safety rules," these rules are better characterized as "loss prevention" or "cash management" rules designed to secure company receipts, as reflected by the cash shortage and casualty loss memoranda issued from 1985 to 1996. Although the Court does not disagree that some correlation may exist between fewer robberies to a particular business and common knowledge that that business keeps little cash on hand,[9] the Court is not persuaded that the "major safety rule" exception was intended to include rules with such an attenuated impact on plant or employee safety. Defendant's argument requires a very broad interpretation of the major safety rule exception, and as noted above, it is well settled that exceptions to overtime pay requirements are to be construed narrowly.[10]

Furthermore, even if the Court agreed that the deductions of 70% of the 107 managers fell within the "major safety rule" exception, the Court is persuaded that the improper deductions experienced by the remaining 30% are sufficient to establish a policy or actual practice of making improper deductions.

8. The requirement that an employee not resist a robbery attempt relates more to safety. However, Defendant has presented no evidence that any of the deductions at issue were made for resisting a robbery attempt.

9. Defendant has filed the expert reports of John J. Hogan and Richard M. Swanson to support its argument that the cash handling and bank deposit procedures constitute safety rules of major significance (Exhibits 32 and 33 to Defendant's Exhibits In Support Of Its Cross–Motion For Partial Summary Judgment, And In Opposition To Plaintiffs' Motion For Partial Summary Judgment (Docket No. 1644)). For purposes of ruling on the pending motions, the Court will accept the experts' opinions that there is some link between employee safety and certain prevention programs. (*Id.*) The Court does not accept, however, the experts' opinions as to the appropriate legal interpretation of the phrase "safety rule of major significance."

Thus, these opinions have little, if any, probative bearing on the Court's conclusion that, under the relevant legal authority, the connection between Defendant's cash handling and bank

deposit procedures and employee safety is too tenuous to fall within the major safety rule exception. As "liability opinions," they are also of questionable admissibility under Rules 701, 702 and 704 of the Federal Rules of Evidence. *See, e.g., Woods v. Lecureux,* 110 F.3d 1215, 1219–21 (6th Cir.1997); *Berry v. City of Detroit,* 25 F.3d 1342, 1353–54 (6th Cir.1994).

10. That the "major safety rule" exception is to be applied narrowly is supported by the procedural history of the "salary basis" regulation. A proposed amendment to the original "salary basis" regulation allowed deductions for "safety rules." (19 Fed.Reg. 4405–4406 (July 17, 1954), Exhibit 120 to Class Plaintiffs' Reply To Defendant's Response To Class Plaintiffs' Motion For Partial Summary Judgment And Class Plaintiffs' Response To Defendant's Motion For Summary Judgment (Docket No. 1771)). The amendment was later changed to its present form, which limits the exception to "safety rules of major significance," including "only those relating to the prevention of serious danger to the plant or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines." (*Id.*)

Accordingly, the Court concludes that Defendant has failed to comply with the salary basis regulation in connection with its Restaurant Managers or Assistant Restaurant Managers.

### V. *Window Of Correction Defense*

■ Alternatively, Defendant argues that even if violations of the salary basis test occurred, it may avoid liability for those violations by relying on the "window of correction" defense. The salary basis regulation describes the "window of correction" defense as follows:

> The effect of making a deduction which is not permitted under these interpretations will depend upon the facts in the particular case. Where deductions are generally made when there is no work available, it indicates that there was no intention to pay the employee on a salary basis. In such a case the exemption would not be applicable to him during the entire period when such deductions were being made. On the other hand, where a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future.

29 C.F.R. § 541.118(a)(6). Defendant argues that because the deductions in this case were made for reasons other than lack of work, they are entitled to application of the defense.

The Supreme Court applied the window of correction provision in *Auer v. Robbins,* allowing the employer to correct a single impermissible deduction made "under unusual circumstances." 117 S.Ct. at 912.[11] In reaching its decision, the Court rejected the plaintiffs' argument that the reimbursement must be made immediately upon the discovery of the improper deduction, and explained that "inadvertenc[ce]" and "made for reasons other than lack of work" are to be read as alternative requirements. 117 S.Ct. at 912. The Court did not address, however, whether the window of correction is available to an employer who had an actual practice of making deductions pursuant to an established policy.[12]

The courts are split on this issue. *Cf. Klein,* 990 F.2d at 287–88 (Salary deductions made pursuant to an employer's discipline policy may not be remedied by the window of correction); *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 617 (2d Cir.1991)(same); *Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 255–57 (S.D.N.Y.1997)(same); *Klem v. County of Santa Clara,* 1998 WL 440425 (N.D.Cal. July 9, 1998) (same); *with Arrington v. City of Macon,* 973 F.Supp. 1467, 1474–75 (M.D.Ga. 1997)(City entitled to preserve exempt status of employees who were subject to impermissible policy of deductions through window of correction); *Kuchinskas v. Broward County,* 840 F.Supp. 1548, 1556–58 (S.D.Fla.1993), *aff'd without opin.,* 86 F.3d 1168 (Table), 3 Wage & Hour Cas.2d (BNA) 1440 (11th Cir. May 17, 1996)(County entitled to preserve exempt status of employees despite policy of deductions); *Simmons v. City of Fort Worth,* 805 F.Supp. 419, 424–25 (N.D.Texas 1992)(Same); *Johnson v. Chicago Housing Authority,* 1997 WL 757737, at *4 (N.D.Ill. Nov.24, 1997)(Court states "... the [*Auer*] Court broadly stated that the window of correction is open in all situations but one: when an employer takes prohibited pay deductions because of a lack of work."). *See also Childers v. City of Eugene,* 120 F.3d at 946 (One-time deduction over ten-year period qualifies for window of correction); *Davis v. City of Hollywood,* 120 F.3d 1178, 1180–81 (11th Cir.1997)(Four deductions in eight-year period qualifies for window of correction);

---

11. Defendant has not argued that the deductions at issue here were made "under unusual circumstances."

12. The Secretary of Labor's position in *Auer* was that the employer could correct the single disciplinary deduction at issue there, but that an employer could not take advantage of the window of correction when it engages in a pattern of improper deductions. (Brief For The United States As Amicus Curiae Supporting Affirmance, at 28–29) (Exhibit B to Appendix To Class Plaintiffs' Memorandum In Support Of Partial Motion For Summary Judgment (Docket No. 1418)). *See also Klem v. County of Santa Clara,* 1998 WL 440425 (N.D.Cal. July 9, 1998), at *5.

The Secretary of Labor has filed an amicus curiae brief in this case setting forth her view of the window of correction defense. The Secretary's position is that: "The 'window of correction' should not be read to allow an employer to retain the statutory exemption from paying overtime compensation, where that employer has engaged in an actual practice of making impermissible deductions from pay, as occurred here." (Secretary of Labor's Brief As Amicus Curiae, at 8 (Docket No. 1758)).[13] According to the Secretary, the regulation's focus is on the intention of the employer:

> The 'window of correction' regulation begins by stating that the effect of any improper deduction 'will depend upon the facts in the particular case.' ... This highlights the importance of the context in which a deduction is taken. The crux of the regulation is to be found in the next two sentences. They speak of a situation '[w]here deductions are generally made when there is no work available' as indicating that there was no intention to pay the employee on a salary basis'; in such a situation 'the exemption would not be applicable to him during the entire period when such deductions were being made.' ... In other words, an employer's objective *intention* to pay the employee on a 'salary basis' is determinative of whether an employer can take advantage of the 'window of correction.'

(*Id.*, at 13–14 (citations omitted)). Therefore, the Secretary explains, an employer who has engaged in a practice of making deductions, or has a policy that effectively communicates that deductions will be made, "necessarily has no intention of paying its employees on a 'salary basis,' and therefore has no recourse to the 'window of correction' for actual deductions made." (*Id.*, at 14).

The last sentence of the regulation, upon which Defendant bases its argument, begins with the phrase, "[o]n the other hand," and, according to the Secretary, "cannot be read without reference to the two sentences that precede it and that discuss the implications of an employer lacking the intent to pay its employees on a 'salary basis.'" (*Id.*). Therefore, "[t]he two kinds of deductions referenced in the latter sentence—a deduction that is 'inadvertent' or one that 'is made for reasons other than lack of work' (the exact opposite kind of deduction referenced earlier in the regulation to show a lack of intent on the part of an employer to pay in accordance with the 'salary basis' test)—do not alter this overriding, threshold principle." (*Id.*)

As the *Auer* Court has made clear, the Secretary's interpretation of her own regulations is entitled to great deference: "[b]ecause the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation.'" 117 S.Ct. at 911. The window of correction defense is part of the salary basis regulation, and therefore, the Secretary's interpretation in that regard is also controlling unless plainly erroneous or inconsistent with the regulation.

This Court concludes that the Secretary's proposed interpretation meets that standard. The Court agrees that the threshold consideration in the regulation for determining whether an employer can take advantage of

---

**13.** In an opinion letter issued on December 24, 1991, the Secretary foreshadowed her current position:

> The effect of making impermissible disciplinary deductions from 'salaried' employees is discussed in § 541.118(a)(6). Where a one-time disciplinary deduction is made, the exemption will not be considered to have been lost in all workweeks if the employer reimburses the employee for such deduction and agrees to not take any such impermissible deduction in the future. Where disciplinary deductions not permitted by the Regulations occur on a regular and recurring basis (e.g., because of an employer's policy), we would question whether such employees, including all

those in the 'class' or 'category' of employees affected by such deductions, are actually paid on a salary basis and the exemption may be denied in all workweeks.

(Salary Basis, Wage & Hour Manual (BNA) 99:5257 (attached to Secretary Of Labor's Brief As Amicus Curiae (Docket No. 1758))).

The *Court also notes that in 1995, counsel* advised Defendant that employees could claim the deductions for cash losses were made pursuant to an established pattern or practice, which could render the window of correction defense inapplicable. (Letter dated February 14, 1995 from M. Megan Shemwell to Grace Burdette; Exhibit 82 to Class Plaintiffs' Motion).

the window of correction is whether that employer evidenced an intent to pay its employees on a "salary basis." *See, e.g. Klem,* 1998 WL 440425, at *6; *Hoffmann,* 982 F.Supp. at 257. Engaging in a pattern of deductions, or having a policy that effectively communicates such deductions will be made, is inconsistent with an intent to follow the salary basis regulation. *Id.* The Secretary's interpretation is neither clearly erroneous, or inconsistent with the language of the regulation, and, in fact, is correct. In addition, the Secretary's interpretation is consistent with the well-established rule that exemptions from the FLSA are to be narrowly construed.

Moreover, as explained in the Secretary's brief, "should Shoney's' argument prevail, the 'salary basis' test would effectively be shorn of all meaning." (Secretary's Brief, at 2). *Id.* An employer would be able to treat otherwise exempt employees as non-exempt by subjecting their pay to reduction, and at the same time refuse to pay these employees overtime. (Secretary's Brief, at 17). But if the employer is sued, it can still avoid the payment of overtime simply by reimbursing the employees for the deductions and promising to comply in the future.[14] *(Id.)* As the Secretary points out:

> An employer could thus retroactively take advantage of the statutory exemption from paying overtime compensation irrespective of how egregiously it flouted the 'salary basis' test. The Secretary did not intend to provide employers that engage in a practice of making impermissible deductions under the 'salary basis' test with such an escape hatch.

(Id.). As noted above, two other courts have explicitly agreed with the Secretary's interpretation. *See Klem,* 1998 WL 440425, at *4–6; *Hoffmann,* 982 F.Supp. at 255–57.

Applying the Secretary's interpretation here, the Court is persuaded that Defendant has engaged in a pattern of improper deductions. Even if the Court limits the applicable

time period to the three years prior to the date suit was filed, as requested by Defendant, it is undisputed that during a thirty-month period, Defendant made at least 1,229 deductions for cash and/or casualty losses through payroll deductions from the salaries of its General Managers and Assistant Managers. As noted above, 107 of 3,048 managers, or 3.5 %, were affected. And accepting Defendant's own numbers as accurate, the managers who experienced deductions were employed at approximately 23% of Defendant's restaurants, and 40% of its operational areas. Other courts have determined that smaller percentages than are involved here constitute a pattern of deductions. *See, e.g., Klem,* 1998 WL 440425, at *2 (Window of correction unavailable to employer who suspended 53 of 5,230 employees [or approximately.01%] over a six-year period in violation of the salary basis regulation); *Rushing v. Shelby County Government,* 1997 WL 901901, *4 (W.D.Tenn. April 23, 1997)(Window of correction unavailable to county employer who made seven deductions involving several employees in 1992 and 1995).

Therefore, the Court concludes that Defendant is not entitled to take advantage of the window of correction defense, and that Plaintiffs are entitled to receive the overtime pay accorded to non-exempt employees under the FLSA.

## VI. *Defendant's Fifth Amendment Argument*

Finally, Defendant argues that the Court should not grant Plaintiffs' Motion because the Court's limitation on discovery in this case has violated its Fifth Amendment right to due process. In prior opinions, after substantial briefing by both sides, the Court rejected Defendant's insistence that it be allowed to obtain discovery from each of the opt-in class members. Defendant was permitted to take all necessary discovery, but not all that it wanted. The simple response to Defendant's argument is that the Court has considered it, and the numerous other

---

**14.** The Court also notes that Defendant's interpretation, which ignores the intent of the employer, leads to illogical results. The window of correction defense would be available to an employer who had an actual practice of making

deductions pursuant to a well-established policy, but would not be available to an employer who had a well-established policy but had made no actual deductions.

voluminous arguments made by the Defendant, in making its previous decisions about discovery.

Furthermore, the conclusions reached in this Memorandum rely on evidence, including documents and statistics, that the Defendant does not dispute. In short, Defendant has not shown how additional discovery in this case would advance the resolution of the issues presented here.

## VII. *Conclusion*

Accordingly, the Court concludes that Class Plaintiffs' Motion For Partial Summary Judgment (Docket No. 1416) is GRANTED and Defendant's Motion For Partial Summary Judgment (Docket No. 1640) is DENIED.

It is so ORDERED.